## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| VERONICA R. GRAGE, | Civil No.  12-2590 (JRT/JSM) |
| Plaintiff, | |
| v. | **MEMORANDUM** |
| | **OPINION AND ORDER ON** |
| NORTHERN STATES POWER CO. – | **CROSS MOTIONS FOR** |
| MINNESOTA, | **SUMMARY JUDGMENT** |
| Defendant. | |

---

Matthew H. Morgan and Timothy C. Selander, **NICHOLS KASTER, PLLP**, 80 South Eighth Street, Suite 4600, Minneapolis, MN  55402, for plaintiff.

Marilyn J. Clark, Melissa Raphan, and Ryan E. Mick, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402, for defendant.

Plaintiff Veronica Grage brings this claim against her employer, Northern States Power Company – Minnesota ("NSP") for failure to pay her overtime in violation of the Fair Labor Standards Act ("FLSA").  Both parties move for summary judgment.  NSP argues that there is no genuine dispute of material fact that Grage is exempt from overtime under the FLSA because her position as a "Supervisor I" falls under either the "administrative" or the "combination" exemption of the FLSA.  Grage moves for partial summary judgment, arguing that there is no genuine dispute of material fact that one of the three requirements for the administrative exemption is not met.  The Court concludes that undisputed facts indicate that Grage does not fall within the administrative

exemption because her primary duty does not directly relate to the management or general business operations of NSP. The Court also concludes that she does not fall within the combination exemption. The Court will therefore deny NSP's motion for summary judgment and grant Grage's, but only in part, because it concludes that fact issues remain with regard to the question of liquidated damages.

## BACKGROUND

Grage was hired by NSP in 1978. She first worked as an account clerk and has also worked as a job closer, senior associate, and damage prevention coordinator before becoming a "Supervisor I." (Third Decl. of Matthew H. Morgan, Ex. 3 (Dep. of Veronica Grage ("Grage Dep.") 31-32), Nov. 20, 2013, Docket No. 72.) She became a Supervisor I in June of 2007, and in that role has worked exclusively at NSP's Chestnut Service Center, which covers a geographic area including all of Minneapolis, Golden Valley, Crystal, Fridley, and Columbia Heights. (*Id.* 32-33.) Jeffrey Custer was her manager for her first eight to nine months as a Supervisor I and she has reported to Steve Smieja ever since. (*Id.* 32.)

## I.   BASIC JOB DUTIES OF SUPERVISOR I

As a Supervisor I at the Chestnut Service Center, Grage is primarily responsible for compiling service work orders and assigning them to work crews to be completed. There are twenty-six men who work at the Chestnut Service Center available to be assigned to work crews. Grage receives work orders from other employees called "designers," and creates a schedule based on the work that needs to be done, creating

work crews based on the number of people and hours necessary for each task, and ensuring that there is equipment available for each project.

### A.      Grage's Account of Her Job Duties

In her deposition, Grage explained her job duties as follows:

> I give [the work crews] their job duties.  I hand out their work packet to them every day.  And if they need extra help with another crew or if they have to dig a hole and there's a ton of underground facilities in the ground, . . . it's my responsibility to have what they call a vac truck.  It's an outside contractor that I have to set up to schedule with them.  I set that up to make sure that this job gets done safely.

(Grage Dep. 45.)  She further explained that she has "26 employees . . . to fill my roster with," and that this can involve arranging them into crews of various sizes, which are assigned a variety of projects with a variety of equipment.  (*Id.* 56.)  She testified that this kind of arranging is necessary because "you have to have a certain type of work to give to a certain crew, because of the trucks and the work that – any crew can do anything if they have the right equipment and truck to do it."  (*Id.*)  She receives and discusses the work orders delineating each job at meetings with the designers, who generate the work orders.  (*Id.* 199-201.)  Each designer submits jobs that need to be done, which are included in a report which lists the job, an "in-service" date, and the designer submitting the work order.  (*Id.* 202.)  After the meetings, Grage assigns work crews to the various work orders.  (*Id.* 202-03.)

According to Grage, her determination of the number of crews working on a given day depends on her assessment and evaluation "of what jobs need to be done and how to get [them] done."  (*Id.* 57.)  She also determines the composition of each crew:

> every guy cannot work with every guy. We have foreman, we have journeymen, we have apprentices, and now we have a helper. Two apprentices cannot consist of a crew. You have to make sure you have the right crew complement. You have to make sure that you have the right vehicle. You have to make sure you have the right equipment to do the jobs.

(*Id.* 86-87.) Grage explained that she has to try to plan in advance so that the same equipment is not needed for two different tasks on a given day. (*Id.* 59.) If it happens that the same piece of equipment is needed on a given day, she looks at the job and "work[s] with the designer of the job. And I have to work with the designers to see which one is a priority." (*Id.*)

Grage is also responsible for adjusting the schedule to accommodate emergencies or other situations requiring a change in the schedule. She decides what jobs the crews will start with and, if a situation arises in the middle of the day, she is responsible for reassigning crews to different locations or jobs and allocating equipment based on the jobs. (*Id.* 58.)

When designers give her work orders, she has to accept the work orders. This part of her job is called "work acceptance process" – the handoff of a work order packet from the designer to the Supervisor I. (Second Decl. of Matthew H. Morgan, Ex. 6 (Dep. of Jeffrey Custer ("Custer Dep.") 88), Oct. 31, 2013, Docket No. 66.) This responsibility requires her "to understand, know and be able to figure out [] the materials," to see if they are correct and, if not, to give them back to the designer to be fixed. (*Id.*) To accomplish all of this, she is required to log on to an application at the start of the workday that includes several bullet points of what a Supervisor I is required to do, including "[c]heck

calendar for vacation, meetings, et cetera," and "[c]heck PPWR's for referrals from TRBL screen print to process," "[c]omplete crew roster by 6:50," "[p]rocess incoming work orders, work acceptance process, RFO's, material locates, permits, equipment, etc." (Third Morgan Decl. Ex. 4 (Dep. of Stephen Smieja ("Smieja Dep.") 37-39).)

Grage estimates that fifty percent of her job is office work, the other part is scheduling, and she acknowledges that her work is "office or non-manual" work. (Grage Dep. 245-48.) At one point in her deposition she was asked about how she describes her job to others in social situations:

> Q: What do you tell people—how do you describe your job when people ask you what you do, whether you're meeting them for the first time or whatever the circumstances might be?
>
> A: I tell them that I work with the underground crews in Minneapolis. I schedule the work for approximately 26 guys.
>
> Q: Okay. That's pretty much the description you give if somebody asks you what you do?
>
> A: If they sounded more interested I would say more. But that's about it. 'Cause sometime they don't sound interested. So most of the time.
>
> Q: I'm extremely interested. So one of those people who is interested, how do you expound upon your responsibilities?
>
> A: Actually I tell them that I get to go to work and I get to tell 26 guys what they have to do today.
>
> Q: A dream come true for my wife if she could have it. Okay.
>
> A: So I dispatch work to various guys, you know, various crews for the day. I said, "And there's a lot to it." I said, "You have to be organized and you have to be able to multi-task. And you have to be able to change directions in the snap of a finger."

(*Id.* 120-21.)

### B.    NSP and Grage's Supervisors' Accounts of Her Duties

According to Grage's supervisor Smieja,

[Grage] manages the process from finding out that the job is going to working with the designer to making sure that packet is correct and we have the right accounting and the right material to, to coordinating other entities, whether it be contractors that need to work with us to complete the project or the city or state or county officials that will be working on their property to actually the proper skillsets, if you will, of the crew members to complete the project, to getting them the equipment and the trucks they need to complete it and basically write down the [sic], going in in the morning and handing it to them and go, okay, this is what we're doing on this job . . . .

(Smieja Dep. 61.)  He considers her the "[h]ub to success of the organization," or "a crucial cog."  (*Id.* 74.)

NSP Director of Design and Construction Jeffrey Custer describes the Supervisor I position as having "a primary job function of[] scheduling work . . . . They work with our design department . . . , that works with customers to create designs."  (Custer Dep. 8, 26.)  He explained that "Supervisor I's would negotiate with those designers on dates for the work to be accomplished.  They would also once they get that work agree to the dates, they would need to prioritize what work gets done when."  (*Id.* 26.)  According to Custer, Supervisor Is must figure out which equipment is required, make sure that permits are in place, make sure any pre-work is done, and reprioritize on a day-to-day basis and throughout the day based on emergencies that arise.  (*Id.* 26-27.)  NSP classifies Grage's job, Supervisor I, in the "production operations" job family at NSP because "it is part of supplying energy to our customers," which is NSP's business function.  (Second Morgan Decl., Ex. 7 (Dep. of Mollie Kelman ("Kelman Dep.") 63).)

### C.       History of the Position at NSP

Supervisor Is were previously referred to as schedulers, even though the responsibilities largely remained the same after the position's title change. (Custer Dep. 42-44.)  They were also called coordinators, which were salaried, and had largely the same responsibilities.  (*Id.*)  In describing the transition to Supervisor Is, a former NSP Human Resources employee stated, "Well, we already had a coordinator position that was in place so we used that as a baseline, but the team had a desire to create a career path, and so one of our responsibilities was to compose the job description to include the new responsibilities which would be managing, directing, prioritizing, re-prioritizing work for those incumbents" [meaning the people transitioning from the coordinator to the Supervisor I position].  (Aff. of Ryan E. Mick, Ex. D (Dep. of Kathryn Gade) 20, Nov. 20, 2013, Docket No. 75.)

The Manager of Compensation who is in charge of FLSA classifications agreed that it was accurate that when that change was made, "there was no independent review of the Supervisor I position regarding classification because the Coordinator position had been an exempt position, and then there was the creation of the Supervisor I and II positions, and it just continued to remain as an exempt position." (Kelman Dep. 10, 83-84.)

II.     **SPECIFIC ASPECTS OF GRAGE'S DUTIES**

The record includes details of several specific aspects of Grage's duties and expectations in her role as a Supervisor I.  The Court will recite those that are relevant to the instant motions.

A.      **Prioritization of Work Orders**

Part of Grage's job is to prioritize different work orders to maximize the work of the crews and the use of equipment.  Sometimes this requires adjusting the schedule.  In discussing her responsibility regarding daily plan adjustments, Grage explained that this is important because "you want to give work to the crews to make sure that you're utilizing them to the best of their ability.  You don't want to give them a job with a truck they cannot get the work done in."  (Grage Dep. 86.)

Some of the considerations that go into prioritizing and scheduling work include employee absences, the amount of pre-work required for a specific order, and the in-service date.  (*Id.* 86-87, 133.)  Sometimes jobs need pre-work, such as boring or approval to dig, so she has to take into account how much lead time certain types of projects might require.  (*Id.* 133.)  Grage testified that it can be a challenge to do this work because of employee absences, so "[j]ust trying to put all that together can be a challenge."  (*Id.* at 94.)  The "in-service date" is a major piece of how a job is prioritized.  (*Id.* 203.)  She explained that "[e]ach job has an in-service date.  So in the morning if I come in and we had a crew work last night and a certain job had to be pushed out, a lot of it depends on the in-service date of each job.  I look at the . . . job, you know, how long

we've had it, if I've had a crew on it.  Many things go into that." (*Id.* 86.)  She sometimes determines when an in-service date can feasibly be achieved, but she estimated that she is overruled by Smieja approximately twenty percent of the time. (*Id.* 206-07.)  According to Grage, the designers are the ones that typically drive any changes in the in-service date. (*Id.* 205-07.)

Although Grage frequently suggested in her deposition that it is the designers who lay out the demands of each job, Smieja claimed that Grage establishes on her own what type of crew she needs and the equipment, not with the designers. (Smieja Dep. 87-88.) Similarly, Custer stated that Supervisor Is, not the designers, decide what equipment is used on the site by the work crew, as the work orders do not contain information about equipment or how many people should be on a particular work crew for a certain job. (Custer Dep. 55-56.)  However, in the event of a conflict between a designer and a Supervisor I over the priority of a particular work order, Custer stated that there is no protocol in place for determining whose opinion supersedes. (*Id*. 104.)

Some aspects of the work orders are not part of Grage's job and are left to the designers.  For example, she does not know what type of customer a given assignment is for – the paperwork she gets from the designers does not say whether it is an apartment building, a mall, or a single-family residence – she would have to ask the designer. (Grage Dep. 87-88.)

### B.      Supervision by and Relationship with Smieja

The parties offer somewhat conflicting testimony over how much prioritization and adjusting for emergencies is left to Grage as opposed to being subject to review by her supervisor Smieja.  When asked if "Smieja defers to [her] judgment and discretion in setting up [a] daily work plan," Grage answered "correct."  (*Id.* 77.)  But Smieja testified that he sits very close to her, such that when she "is on the phone making decisions about who should go where and what crews should go out where," Smieja can hear what she is saying or doing and could redirect or correct her.  (Smieja Dep. 45-46.)  Furthermore, Grage disagreed with the statement that Smieja has always been "on board" with her decisions, explaining that

> he can overrule me, and he has. . . .  [E]specially because he talks to the other managers and the other – you know, . . . I work with the Supervisor I's, and if it works into my schedule that I can or I can't send another body, we're good.  But sometime the managers talk about stuff that needs to get done and they don't tell the Supervisor I's that do the scheduling, and so we can be overruled.

(*Id.* 167-68.)  She further stated that if she did not make the correct decisions as far as assigning crews and deciding the make-up of crews, assigning equipment, and assigning tasks, she "would be reprimanded by my manager."  (*Id.* 183.)  "So as far as major decisions, I guess depending on [Smieja] and how he's feeling, I almost feel that I almost have to ask him about everything sometime.  It all depends on the level of comfort that I have with him on a given day."  (*Id.* 275.)

But when Smieja has been out for weeks at a time, she takes on more responsibility.  She described a time when Smieja left for a few weeks to assist with

hurricane Sandy, and she ran the crews on her own, but there was another manager who helped out with things, including, for example, Request for Outage Forms, with regard to which she testified that she was not certain how they should be written: "That's more of a manager role when it comes to the electricity and what has to be done here and there." (*Id.* 73-74.)

At a different point, Smieja was away from the Chestnut Service Center because he was helping to cover Maple Grove, but she still consulted with him frequently:

> I'm handling most of 'em.  But I have to be careful.  Because when [Smieja] is available to talk to, I talk to him.  If I make any wrong decisions that [Smieja] does not like, I will hear about it.  Believe me.  I talk to him on a lot of issues when he is available to talk to.

(*Id.* 150-51.)

### C.     Printed Job Description Materials

Much of counsel for NSP's questioning of Grage during her deposition centered around her printed job description and her interpretation of various statements made by her and her manager in her written annual performance reviews.  Upon questioning regarding a printed job description, Grage agreed that the following are accurate statements of the competencies required for success as a Supervisor I: "Job/Technical Expertise, Initiative & Innovation, Adaptability & Change Management, and Project/Program Management."  (*Id.* 50.)  She testified that she achieves the "Initiative and Innovation" competency "by prioritizing [her] work and handing it out to the crews that can do that job and [she] get[s] the work done."  (*Id.* 51.)  For example, an "aggressive goal" that she set for herself included "[m]aking sure that the primary faults

get done in a very timely manner," meaning that faulted underground wires get fixed as soon as possible.  (*Id.* 51-52.)   She explained that if they were not fixed in a timely manner, she "would hear about it from [her] manager.  And then he would hear about it from his manager.  And they would want to know why aren't these getting done."  (*Id.* 52-53.)

She also testified about the competency description within the Initiative & Innovation category titled "calculated risk taking."  She explained:

> If I have a lot of jobs set up today and I'm expecting – you know, you expect a certain amount of guys to come in today, I've got it all planned out, and then last night we had a huge outage and four of my guys had to work that and they're all on rest today.  You know, sometimes [Smieja] and I talk and, you know, 'Can you spare to do this, can you spare to do that today.'  And I say[], 'It's real tight today.'  I said, 'I've got a lot of things scheduled that, you know, the designers were talking to me about and they'd really like to get them done today.'

(*Id.* 54-55.)  She agreed that she takes risks in her job because it is possible that there will be an emergency and she may have to take a crew or equipment off a planned job.  (*Id.* 60.)  She testified that she does not know about or whether there are potential cost implications for NSP when she does this.  (*Id.*)

She also agreed that she "[d]ecides and acts without having the picture totally defined," and gave an example: she explained that the 24-hour control center calls on occasion indicating that a crew is needed but without giving much information, which

> is an example [of] where I don't know the total picture, but they are going to need a crew.  So I look at my crews that I have assigned to certain jobs for the day, and I have to start figuring out which crew I'm going to pull from which job to get this done.  Again, I have to review the different jobs that I have given out, the trucks, and to my guesstimation I do what I can to make that get done.

(*Id.* 62-63.)  It is up to her judgment which crew to pull, but her "boss is sitting right beside" her and sometimes says, "[n]ope, let's do it this way."  (*Id.* 63)  She estimates that she gets overruled ten percent of the time in these situations.  (*Id.*)

In her deposition she was also asked about one of her performance evaluations, which stated that she "developed materials, managed process, helped develop program to track issues and identify issues."  (*Id.* 68.)  She explained that this was in the context of a vault inspection project, through which the crews inspected about 200 vaults.  (*Id.* 68-69.) She had to make sure that each vault was inspected.  (*Id.* 70.)  She explained,

> I had a sheet . . . that the engineer developed that the crews had to go down into each vault on and, you know, go through this sheet. . . . I just had to make sure that all the vaults were inspected.  Each one was inspected.  Each of these sheets were filled out.

(*Id.* 70-72.)  She was asked in her deposition about which materials she developed, to which she answered "[t]he material thing I'm not sure about."  (*Id.* 70.)  When asked again about what program she developed to track issues and identify issues, she explained that it was a "[s]preadsheet.  I helped develop a spreadsheet for that."  (*Id.*)  She explained that "[t]he spreadsheet had columns of all the information that was on this form that the engineers put. . . . And so the guys went into the vault and gathered the information, and then all of it was put on this spreadsheet."  (*Id.* 70-71.)

When asked how she demonstrates leadership as a Supervisor I, she explained:

> I listen when somebody comes to my desk and asks me a question.  I give them my full attention.  I mean, I can kind of say what is here.  I refrain from judging the person.  When I go to a meeting, I'm prepared and I'm on time.  I treat people with respect.

(*Id.* 112.)

## D.    Management Responsibilities

Grage testified that she does not have responsibility for the formal performance management process, nor for "coaching," which has a disciplinary connotation when used at NSP, but that she does provide guidance to the crews.  (*Id.* 44-45.)  She testified that she does not participate in discussions about disciplinary action for crew members and Smieja has never asked for her input on a discipline question.  (*Id.* 90.)  She has no employees reporting to her and does not do performance reviews, nor does she make any suggestions or recommendations as to hiring, firing, advancement, or promotion.  (*Id.* 245-46; *see also* Custer Dep. 41.)  Grage testified that she does answer questions from the work crews about job assignments, but if they have more technical questions or union issues, they go to Smieja.  (Grage Dep. 46, 177-78.)

Grage is also not involved in compliance matters – she does not know what "compliance with regulations, PUC rules and company standards" entails.  (*Id.* 106.)  She also does not know what the implications are for NSP if she fails on a permit or notification and a project gets shut down, rather, "[if] the permit is not in the folder, I give it back to the designer."  (*Id.* 110.)

## ANALYSIS

## I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of

law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.   FLSA AND EXEMPTIONS

Grage claims that NSP has failed to pay her overtime in violation of the FLSA, which requires employers to pay overtime compensation to employees that work more than forty hours in a workweek.  *See* 29 U.S.C. § 207(a)(1).  Some types of employees, however, are exempt from the FLSA's overtime requirement.  *See* 29 U.S.C. § 213(a) (listing exemptions).  For example, an employee employed in a "bona fide executive, administrative, or professional capacity," is exempt from the overtime requirement.  *See* 29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.708.  The employer bears the burden of establishing that the exemption applies and excuses it from the overtime requirement. *Mitchell v. Ky. Fin. Co.*, 359 U.S. 290, 291 (1959); *McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 999 (8th Cir. 2003).  Given the remedial nature of the FLSA, exemptions under the Act are to be "narrowly construed in order to further Congress' goal of providing broad federal employment protection."  *Spinden v. GS Roofing Prods. Co.*, 94 F.3d 421, 426 (8th Cir. 1996) (internal quotations omitted); *see*

*also Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960) ("[E]xemptions are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit."). "The question of how the [employees] spent their working time . . . is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law[.]" *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).

## III.   ADMINISTRATIVE EXEMPTION

NSP claims that Grage falls within the exemption for employees employed in a bona fide administrative capacity. Regulations promulgated by the Secretary of Labor in accordance with the Secretary's authority under 29 U.S.C. § 213(a)(1) delineate what constitutes employment in a bona fide administrative capacity. The regulations, which were most recently revised in 2004, state that

> The term "employee employed in a bona fide administrative capacity" in section 13(a)(1) of the Act shall mean any employee:
>
> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . .;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200. In order for an employee to be exempt under the regulations, all of these requirements must be met. *See Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050, 1067 (D. Minn. 2011) (observing that "[f]or the administrative exemption to apply,

[the employer] must also show that Plaintiffs[]" met the discretion element, in addition to the second element).

The parties do not dispute that Grage satisfies the first requirement, but dispute both of the substantive requirements in 29 C.F.R. § 541.200(a). With regard to the second requirement, whether her primary duties are "directly related to the management or general business operations of the employer or the employer's customers," 29 C.F.R. § 541.200(a)(2), both parties move for summary judgment, arguing that the facts relevant to this inquiry are undisputed and that the Court can rule as a matter of law in their respective favors. On the third requirement, only NSP moves for summary judgment; Grage argues that there are genuine disputes of material facts based upon which a reasonable jury could conclude either that her primary duties do or do not involve "the exercise of discretion and independent judgment with respect to matters of significance." *See* 29 C.F.R. § 541.200(a)(3).

For the purposes of this analysis, regulations define the term primary duty as "the principal, main, major or most important duty that the employee performs." *Id.* § 541.700(a). The regulations explain that a "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.* In making that determination, courts may consider, among other things:

> the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.* The regulations further explain that "[t]he amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee," but that "[t]ime alone . . . is not the sole test." 29 C.F.R. § 541.700(b).

## A.    Relation of Work to the Management or General Business Operations

Both parties move for summary judgment on the second requirement in the test for administrative exemption, claiming that the facts regarding the activities Grage performs relevant to this inquiry are not in dispute such that the Court should conclude as a matter of law whether Grage's primary duty is "directly related to the management or general business operations of the employer."   29 C.F.R. § 541.200(a)(2); *see also Icicle Seafoods, Inc.*, 475 U.S. at 714 ("The question of how [a plaintiff] spent their working time . . . is a question of fact.  The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law . . . .").

### 1.    Regulatory Guidance

Regulations in the subsequent section, 29 C.F.R. § 451.201, offer specific guidance as to what it means for work to be "directly related to the management or general business operations":

> The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee.  To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

29 C.F.R. § 541.201(a).  Guidance accompanying the 2004 version of these regulations explains that the administrative operations of the business include the work of employees "servicing" the business, such as, for example, "advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control."   Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees ("2004 Final Rule Guidance"), 69 Fed. Reg. 22122-01, 22138 (April 23, 2004) (internal quotations omitted).  This can include, but is not limited to:

> work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

29 C.F.R. § 541.201(b).

The FLSA Employee Exemption Handbook counsels considering this analysis as one about the "**type** of work" the employee performs: "Is the employee's primary duty the performance of work directly related to management or general business operations?" FLSA Emp. Exemption Handbook, ¶ 400, 2004 WL 5032709 (Aug. 23, 2004) (emphasis in original).  The handbook also counsels that "[t]he word 'directly' is intended to ensure that the administrative exemption is not applied to employees whose primary duty is only remotely or tangentially related to exempt work."  *Id.* ¶ 410, 2004 WL 5032710.

In analyzing this second requirement, courts frequently refer to the distinction suggested by 29 C.F.R. § 541.201(a) between "work directly related to assisting with the

running or servicing of the business," and "working on a manufacturing production line or selling a product in a retail or service establishment."  Courts have applied this to suggest a "production versus staff" or a "production/administrative" dichotomy to determine whether an employee is exempt or not.  *See Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 531-32 (2d Cir. 2009) ("Employment may thus be classified as belonging in the administrative category, which falls squarely within the administrative exception, or as production/sales work, which does not."); *Schaefer v. Ind. Mich. Power Co.*, 358 F.3d 394, 402 (6th Cir. 2004) ("[A] number of courts have applied an administrative versus production analysis, sometimes referred to as the administrative/production dichotomy, to the issue."); *Adams v. United States*, 78 Fed. Cl. 536, 546 (Fed. Cl. 2007) ("[I]f there is mixed authority regarding the type of work and the applicability of the administrative exemption, or perhaps if the work is of a unique nature, the administration/production dichotomy is a useful analytical tool for resolving the question of the exemption.").

But courts have also acknowledged that the dichotomy is not helpful in all circumstances.  *See Schaefer*, 358 F.3d at 402-03 ("[T]he administrative versus production analysis does not fit all cases.  The analogy – like various other parts of the interpretive regulations – is only useful to the extent that it is a helpful analogy in the case at hand, that is, to the extent it elucidates the phrase 'work directly related to the management policies or general business operations.'"); *In re RBC Dain Rauscher Overtime Litig.*, 703 F. Supp. 2d 910, 933 (D. Minn. 2010) ("[T]he production/ administration dichotomy, which is supposed to clarify the phrase 'work directly related

to the management policies or general business operations' in the pre–2004 regulations, is not particularly relevant or helpful to the Court's understanding of the primary duties of RBC's securities brokers under current law." (internal quotation marks omitted)).  The Department of Labor addressed concerns raised by commenters about the dichotomy when promulgating the 2004 revisions to the regulations:

> Commenters . . . have very different perspectives about how the Department should approach the "production versus staff" dichotomy and apply it to the modern workplace. . . .  The Department believes that our proposal struck the proper balance on the "production versus staff" dichotomy.  We do not believe that it is appropriate to eliminate the concept entirely from the administrative exemption, but neither do we believe that the dichotomy has ever been or should be a dispositive test for exemption.  The Department believes that the dichotomy is still a relevant and useful tool in appropriate cases to identify employees who should be excluded from the exemption. . . .  [T]he Department provided in proposed section 541.201(a) that the administrative exemption covers only employees performing a particular type of work – work related to assisting with the running or servicing of the business.  The examples the Department provided in proposed section 541.201(b) were intended to identify departments or subdivisions that generally fit this rule.

2004 Final Rule Guidance, 69 Fed. Reg. at 22141.

The Court will therefore treat the dichotomy as informative but not dispositive, and will also consider the guidance from the list of examples in 29 C.F.R. § 541.201(b).  Although not an exhaustive list, the list of examples in § 541.201(b) suggest types of work that generally facilitate the operation of any enterprise, such as keeping track of finances, managing human resources policies and operations, paying taxes, providing technology services, and complying with relevant laws and regulations.  The Department of Labor explained, in promulgating the regulation, that:

> Based on these principles, the Department provided in proposed section 541.201(a) that the administrative exemption covers only employees performing a particular type of work – work related to assisting with the running or servicing of the business.   The examples the Department provided in proposed section 541.201(b) were intended to identify departments or subdivisions that generally fit this rule.

2004 Final Rule Guidance, 69 Fed. Reg. at 22141.

This suggests another distinction, reminiscent of production versus staff, but less tied to an industrial, factory-oriented economy: that between operations that **service the business itself** and those that carry out the primary, **day-to-day** activities that constitute the business's primary output.   As the court in *Neary v. Metropolitan Property & Casualty Insurance Co.*, 517 F. Supp. 2d 606 (D. Conn. 2007), explained,

> the examples of employees meeting the "directly related" test provided in 29 C.F.R. § 541.201(b), . . . are all duties clearly related to servicing the business itself: it could not function properly without employees to maintain it; a business must pay its taxes and keep up its insurance. . . . [They] are not activities that involve what the day-to-day business specifically sells or provides, rather these are tasks that every business must undertake in order to function.

*Id.* at 614; *see also Bollinger v. Residential Capital, LLC*, 863 F. Supp. 2d 1041, 1048 (W.D. Wash. 2012) ("This list [in 29 C.F.R. § 541.201(b)] distinguishes between work that any employer needs performed – such as accounting, human resources, and regulatory compliance – and work that is particular to an employer's industry.   The former is part and parcel of running a business and therefore exempt administrative work. The latter is not." (internal citation omitted)).

NSP points to cases in which courts have interpreted "directly related to the management or general business operations" broadly – extending it to include activities

that are directly related to operations that are essential to the specific business.  In *Rock v. Sunbelt Cranes, Construction & Hauling, Inc.*, 678 F. Supp. 2d 1264 (M.D. Fla. 2009), the court observed the examples in 29 C.F.R. § 541.201(b) as being "clearly related to the servicing or running of the Defendant's business itself," or, "[i]n other words, the Defendant's business could not function properly without its employees that perform these tasks." *Id.* at 1271.  The court proceeded to conclude that a dispatcher for a crane rental company fell into the administrative exemption because,

> [s]imilarly Sunbelt's business could not operate properly without its dispatch department.  While the particular dispatch department referred to here is unique to crane rental businesses and may not be the sort of department that every business needs to function properly, it is of the sort that a crane rental business must have in order to function. . . . Maintenance of the schedule and Mr. Rock's other responsibilities combined were necessary and of the type that every crane rental business must undertake in order to operate.

*Id.* (emphases omitted).  This analysis expands the guidance from 29 C.F.R. § 541.201 to activities that are essential to the running of a specific type of business – there, crane rental – rather than activities that would be essential to any business – the type of activities that involve servicing the business itself rather than the services the business provides to its customer.[1]  On appeal, the Eleventh Circuit affirmed, but shifted its focus

---

[1] Defendant also points to *D'Angelo v. J&F Steel Corp.*, Civ. No. 01-6642, 2003 WL 1888775 (N.D. Ill. Apr. 14, 2003), in support of its position.  The court in that case applied an expansive view of "management or general business operations" similar to the district court in *Rock*.  The plaintiff there worked for a steel company and her primary responsibilities "involved coordinating steel delivery."  *Id.* at *7.  Relying on the plaintiff's statements in her deposition that her responsibilities were the "heart of the operation" and that she "was the core of the apple," the court concluded that the plaintiff was exempt because, without her responsibilities of coordinating steel delivery, "J&F Steel would have ceased to function."  *Id.*  As with the district court's decision in *Rock*, the Court does not find this reasoning to be persuasive or reflective of the regulations' guidance.

from the district court's reasoning: it acknowledged that Rock did engage in the kind of activities that the regulations deemed non-exempt (there, sales, which the regulations describe as falling on the 'production' side of the dichotomy suggested in 29 C.F.R. § 541.201(a)), but concluded that "the district court properly concluded that Rock met the second prong of the administrative exemption test" because "his primary duties went beyond mere sales" and included significant amount of time spent on "managerial duties," such that his primary duty was "the management of Sunbelt's crane rental division." *Rock v. Ray Anthony Int'l, LLC*, 380 F. App'x 875, 878-79 (11th Cir. 2010) (internal quotations omitted).  It continued, observing that "[t]he district court's finding is consistent with our decision in *Hogan*, in which we concluded that even when employees engage in sales, their duties are administrative if the majority of their time is spent advising customers, hiring and training staff, determining staff pay, and delegating matters to staff."  *Id.* (citing *Hogan v. Allstate Ins. Co.*, 361 F.3d 621, 627 (11th Cir. 2004)).  Thus, it seems that the Eleventh Circuit declined to adopt the district court's extension of the exemption to activities that are merely essential to the business, rather than related to the servicing of the business itself.

The guidance accompanying the 2004 promulgation of the regulations suggests that the administrative exemption was not intended to be applied as expansively as the district court did in *Rock*.  The commentary accompanying the final 2004 rule explains that the Department of Labor had proposed a version that omitted the word "directly" before "directly related," but that

> the final rule reinserts the word "directly" throughout this section. Some
> commenters argue that the deletion of the word "directly" from the existing
> regulations would allow the exemption for an employee whose duties relate
> only indirectly or tangentially to administrative functions. The Department
> . . . has reinserted this term to ensure that the administrative duties test is
> not interpreted as allowing the exemption to apply to employees whose
> primary duty is only remotely or tangentially related to exempt work.

2004 Final Rule Guidance, 69 Fed. Reg. at 22140. The Court will therefore find Grage to

be exempt only if the record indicates that her work is directly related to NSP's

management or general business operations; it is not enough for her work to be essential

because it is the core of NSP's business or for her work to be tangentially related to

management or operations that operate to service NSP itself. *See also Bollinger*,

863 F. Supp. 2d at 1050 ("Defendants seem to argue Plaintiffs' work was important

because it was necessary to bring Defendants' mortgage products to the marketplace.

This view would practically make every worker's duties administrative. It cannot be

reconciled with the duty to construe FLSA exemptions narrowly.").

### 2.    Applied to Grage

Grage's work is a situation in which this element of the administrative exemption

test is difficult to apply: her work involves tasks that appear similar to tasks that are

performed by exempt administrators, such as scheduling and coordinating, but she does

them in a context that is closely intertwined with a non-exempt sphere of work. The

closest analogy to Grage's job – in which she coordinates and schedules tasks, crews, and

equipment – is likely that of a dispatcher, and courts have had many occasions to

consider whether dispatchers fall under the administrative exemption. But, as courts have

recognized, courts addressing dispatchers have been divided over whether the job duties of a dispatcher meet the requirements for the administrative exemption and the precedential value of any such case depends on the specific facts. *See Iaria v. Metro Fuel Oil Corp.*, Civ. No. 07-4853, 2009 WL 222373, *2-3 (E.D.N.Y. Jan. 30, 2009) (collecting cases).

Furthermore, of the dispatcher cases NSP cites, the courts in those cases that have reached the conclusion that a dispatcher fell under the administrative exemption did so nearly entirely on the basis of the inquiry related to the third requirement – the amount of discretion or supervision the given dispatcher exercised – not the extent to which the **type** of work directly related to the employers' general business operations. *See, e.g.*, *Puentes v. Siboney Contracting Co.*, Civ. No. 11-80964, 2012 WL 5193417, at *5-6 (S.D. Fla. Oct. 19, 2012) (relying on *Rock* to find the plaintiff was exempt under the administrative exemption because of his supervisory role and because he was "entirely responsible for dispatching of truckers," where plaintiff "took daily orders from the customers, coordinated and scheduled the truckers, oversaw the truckers, visited job sites daily, acted as liaison with the owners and job superintendents, assured that the trucking work was done correctly to the satisfaction of the customers, and handled any problems or emergencies that arose in the field," such that, "[i]n fact, Plaintiff was in charge of all activities relating to the daily dispatch and running of the trucking services by ST in Central Florida"); *LaPoint v. CRST Int'l, Inc.*, Civ. No. 02-0180, 2004 WL 3105950, *9 (N.D. Iowa June 16, 2004) (basing its reasoning on plaintiff's supervisory role and stating, without explanation that it also found his duties to be directly related to the

general business operations: "the court finds that the fact that he was in charge during his work hours, at least to the extent conceded, only lends support to a determination that he exercised discretion and independent judgment" and "customarily and regularly exercised discretion and judgment as a fleet manager/dispatcher, and was further required to do so, to the degree necessary for him to appropriately be labeled a bona fide administrative employee exempted from the overtime regulations").

Thus, the dispatcher cases, although not particularly clear, suggest that employees who coordinate and schedule work that is the substantive core of an entity's business (as opposed to work that services the business itself) have been found to be exempt only when they exercise significant discretion or management responsibilities.  But exercising discretion and independent judgment alone is not enough to render an employee exempt on account of administrative capacity – the regulations require that the employee's primary duty **both** involve the exercise discretion **and** directly relate to general business operations.  *See* 29 C.F.R. § 541.200(a).  Many of the cases relied upon by NSP seem to conflate the two requirements or treat them as alternatives: the district court in *Rock* even recognized as much: "[s]everal courts have found dispatchers to be exempt under the administrative exemption, but they have done so only after a finding that the employee exercised considerable discretion and supervisory authority."  *Rock*, 678 F. Supp. 2d at 1270.  Leaving the amount of discretion for analysis under the third requirement and instead focusing on the **type** of work and the extent to which it relates to management or general business operations, the dispatcher cases generally suggest that coordination and

scheduling of production work is **not** directly related to the management or general business operation of the employer.

Although this is not dispositive, the Court finds it instructive here. Grage does not **directly** provide the service or product that is NSP's primary production output, but rather her work is entirely composed of facilitating that output, in a way that is very close to and intertwined with the final product. Although her role in doing so mostly involves office work and involves some activities that, on a larger scale or in different context, would be exempt – such as scheduling, prioritizing, calling contractors, organizing work packets, and checking work orders for accuracy – the essence of her work is to be part of the production of NSP's business output. This is similar to the plaintiff's duties in *Alvarez v. Key Transp. Serv. Corp.*, 541 F. Supp. 2d 1308 (S.D. Fla. 2008), where the court considered a night dispatch manager for a chauffeur service. In denying defendant's motion for summary judgment, the court concluded that

> [d]efendant's attempt to characterize Alvarez as an "administrative" employee would render the phrase "directly related to the general business operations of an employer" so broad that almost any job could be shoehorned into it. . . . [T]he Court does not see how a dispatcher could reasonabl[y] fall within any of the listed categories [under § 541.201(b)]. As the Night Dispatch Manager, Alvarez performed duties closer to "working on a manufacturing production line," or "selling a product in a . . . service establishment" because he was working toward fulfilling a customer's need for a service . . . .

*Id.* at 1313; *see also Smith v. Frac Tech Servs., LLC*, Civ. No. 09-679, 2011 WL 96868, at *22-23 (E.D. Ark. Jan. 11, 2011) (field engineers, who "were responsible for making sure that the correct chemicals, sand, and water were onsite at the customer's well, and [who] went to each site and participated in the fracturing process," such that their job was

described as "making sure that the customer's needs were met before, during, and after the job" were "directly involved in producing the good or service that is Frac Tech's primary output – well stimulation by means of hydraulic fracturing – rather than general administrative work applicable to the running of any business"); *Iaria*, 2009 WL 222373, at *4 ("In this case, plaintiffs' duties relate more directly to the service and product that Metro Fuel provides – the delivery of fuel for heating – than they do to servicing the business. . . .   Here, plaintiffs' daily tasks ensured that defendant's product (fuel) was delivered timely and efficiently. . . .   The tasks performed by plaintiffs were not administrative tasks of the type every business must undertake, such as those performed by accountants, personnel officers, and computer programmers.").

Thus, to the extent that Grage does work that is administrative in form, it is ultimately not related enough to NSP's management or general business operations to satisfy the "directly related" standard that the Department of Labor intentionally retained in the regulation.   NSP points to what it argues are the "broad business implications" of Grage's work: the efficient and productive use of equipment, materials, and personnel in a way that affects budgeting, cost-compliance, customer relations, crew morale, and regulatory compliance.   (Mem. in Opp'n to Pl.'s Mot. for Partial Summ. J. at 10-11, Nov. 20, 2013, Docket No. 74.)[2]   NSP also argues that Grage's duties relate directly to "management" because she directs the work of the twenty-six-person field crew out of the Chestnut Service Center, repeatedly highlighting her deposition statement that she "get[s] to tell 26 guys what they have to do today." (Grage Dep. 121.)   But these

---

[2] With the exception of depositions, all page numbers refer to the CMECF pagination.

observations do not bring her work into **direct** relation to the management or general business operations of NSP.  First, her contribution to the company's success on various fronts does not render her activities directly related to the general business operations or management – ostensibly, all employees in a given enterprise contribute to the success of an enterprise.  Under NSP's theory, such reasoning could extend the administrative exemption to any employee who contributed – in small or large part – to the success of an enterprise.  This runs counter to the directive that the exemptions are to be construed narrowly.  *See Spinden*, 94 F.3d at 426 (exemptions are to be "narrowly construed in order to further Congress' goal of providing broad federal employment protection" (internal quotations omitted)).  Second, NSP overstates Grage's role in "managing" the work crews – she assigns work to them, but does not decide what work should be done, does not provide input on disciplinary decisions, does not do performance reviews, and does not make recommendations for hiring, firing, advancement, or promotion.  Her relationship with the work crews does not closely enough resemble "management" to bring her work within the scope of 29 C.F.R. § 541.200(a)(2).[3]

The Court concludes that Grage's work is not "directly related" to NSP's "management or general business operations" as contemplated by 29 C.F.R. § 541.201. It therefore need not reach the third requirement:  whether there are genuine disputes of

---

[3] Even if it did, the term "management" in 29 C.F.R. § 541.200(a)(2) is likely best understood as referring to the management of the employer as an entity, not the management of other employees, which is better captured in the executive exemption.  *See* 29 C.F.R. § 541.100(a) (including in requirements for executive exemption that the employee "customarily and regularly directs the work of two or more other employees" and "has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.").

material fact upon which a reasonable jury could find that Grage's primary duty does not involve the exercise of discretion or independent judgment, because, in order for an employee to qualify for the administrative exemption, the employee must **both** do work that directly relates to the management or general business operations of the employer **and** exercise discretion or independent judgment on matters of significance.  *See Bratt v. Cnty. of Los Angeles*, 912 F.2d 1066, 1071 (9th Cir. 1990) ("None of the Employees, therefore, satisfies the first requirement of the regulation's administrative employee exception, and we need not address whether the Employees satisfy the remaining requirements." (applying an older version of the test in which the first requirement was substantively the same as the second requirement here and included an exercise of discretion requirement)).

## IV.   COMBINATION EXEMPTION

NSP argues in the alternative that Grage qualifies for the "combination exemption" under the FLSA, which exempts "[e]mployees who perform a combination of exempt duties as set forth in the regulations in this part for executive, administrative, professional, outside sales and computer employees," such that "work that is exempt under one section of this part will not defeat the exemption under any other section."  29 C.F.R. § 541.708 (listing as an example that "an employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption").  NSP argues that this exemption applies because, in addition to her

administrative work, Grage performs several types of work that would entitle her to an

"executive" exemption under the FLSA.  The executive exemption covers employees:

(1)   Compensated on a salary basis . . .;

(2)   Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3)   Who customarily and regularly directs the work of two or more other employees; and

(4)   Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).

The Court concludes that summary judgment for NSP on the basis of this exemption is not appropriate.  At best, Grage performs only one of the duties required for the executive exemption – that she regularly directs the work of the crew members.  But there is little dispute that she does not **manage** or discipline the crew members, and the record indicates that she does not have authority, or even influence, over hiring and firing decisions.  Thus, in light of the sparse showing in support of the executive exemption and the Court's determination that she does not perform work exempt under the administrative exemption, the Court declines to grant NSP's motion for summary judgment on this ground.

## V.   LIQUIDATED DAMAGES

Grage argues that, if the Court awards summary judgment in her favor, it should also award her liquidated damages.  An employer who violates the overtime provisions of

the FLSA is ordinarily liable for both the unpaid overtime compensation and an equal amount as liquidated damages. 29 U.S.C. § 216(b). Liquidated damages are not punitive, but rather account for the fact that actual damages, such as costs to the employee arising from the delay in receiving wages, may be difficult to calculate and prove. *Hultgren v. Cnty. of Lancaster*, 913 F.2d 498, 508-09 (8th Cir. 1990). While liquidated damages are the norm, there is a limited, statutory exception for employers who acted in good faith with "reasonable grounds for believing" that they complied with the FLSA. 29 U.S.C. § 260. To demonstrate good faith, employers must show an honest effort to discover and follow the FLSA's requirements. *Chao v. Barbeque Ventures, LLC*, 547 F.3d 938, 942 (8th Cir. 2008).

Grage argues that NSP has not met its burden of demonstrating good faith because "Defendant's corporate designee testified the Supervisor I position has not been audited or reviewed for compliance with the FLSA since its creation in 2007." (Mem. in Supp. of Pl.'s Mot. for Summ. J. at 20, Oct. 31, 2013, Docket No. 65.) NSP argues that when it created the Supervisor I position, it did so by **adding** responsibilities to a prior position, which it also understood to be exempt, through a thorough collaborative effort of over a dozen people, which demonstrates its good faith. (Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 24.) The Court concludes that, taking these pieces of evidence in a light most favorable to NSP, a reasonable jury could conclude that NSP acted in good faith in treating Grage's Supervisor I position as exempt. The Court will therefore deny Grage's motion for summary judgment on the issue of liquidated damages.

The Court will schedule a telephone status conference to determine whether the case is ready to be placed on a trial calendar.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendant's motion for summary judgment [Docket No. 57] is **DENIED**.

2.      Plaintiff's motion for partial summary judgment [Docket No. 62] is **GRANTED in part** and **DENIED in part** as follows:

        a.      The motion is **GRANTED** with regard to whether Grage is exempt from the overtime requirement of the FLSA; and

        b.      The motion is **DENIED** with regard to whether Grage is entitled to liquidated damages.

DATED:   September 16, 2014                    ___s/ John R. Tunheim___
at Minneapolis, Minnesota.                         JOHN R. TUNHEIM
                                          United States District Judge